

FILED
IN OPEN COURT

NOV -8 2022

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PEDRO FELIPE VALDES,<br><br>Defendant. | Case No. 1:22-cr-194 |

## STATEMENT OF FACTS

The United States and the defendant, PEDRO FELIPE VALDES (hereinafter, "the defendant" or "VALDES"), agree that at trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt with admissible and credible evidence:

1. From at least in or about May 2017 through at least in or about April 2018, in the Eastern District of Virginia and elsewhere, the defendant did knowingly devise and execute a scheme and artifice to defraud, and to obtain money, by materially false pretenses, promises, and representations, in connection with the construction of custom homes in and around McLean, Virginia.

2. VALDES lived and worked in the Eastern District of Virginia at all times relevant to the conduct described herein. He had experience in the residential construction industry. VALDES served as the chief financial officer of a residential real estate company prior to the conduct described herein, and he was a licensed general contractor as well as a licensed real estate salesperson in Virginia.

3. On or about December 5, 2014, VALDES created ARTIFACT LLC ("ARTIFACT") with the Virginia State Corporation Commission. ARTIFACT was a company

whereby VALDES and business partners engaged in residential construction and remodeling projects.

4. VALDES's brother ("J.P.V.") owned and operated two limited liability companies. These two companies purchased and remodeled or rebuilt residential properties to resell for a profit.

5. J.P.V. hired ARTIFACT to rebuild or remodel the residential investment properties J.P.V.'s companies purchased.

6. J.P.V. also used VALDES as his real estate agent for the purchase and sale of these investment properties, allowing VALDES to personally earn commissions on the investment properties.

7. At the same time that VALDES, through ARTIFACT, was working on properties owned by J.P.V.'s companies, he was separately soliciting clients to hire ARTIFACT to build custom homes on properties the clients already owned. At times, VALDES showed his prospective clients the work ARTIFACT had performed on the homes purchased by J.P.V.'s companies as well as work ARTIFACT had performed for other clients.

8. VALDES maintained one primary bank account for all ARTIFACT projects and commingled funds from multiple clients. VALDES used client funds for personal expenses and routinely used funds from one client to fund other clients' projects.

9. VALDES successfully completed projects for his brother's companies as well as work ARTIFACT performed for other clients; however, some of ARTIFACT's projects for individual clients were, in fact, not completed as described below.

## Fraud Involving VICTIMS H.Z. and Y.J.

10. VICTIMS H.Z. and Y.J. are the owners of a residential property located on Bethune Street in Falls Church, Virginia, within the Eastern District of Virginia. Y.J. is H.Z.'s spouse.

11. On or about June 9, 2017, H.Z. and Y.J. contracted with ARTIFACT to demolish the existing home and build a custom home on their property on Bethune Street for a fixed price of $520,000 ("the Bethune Street Project"). The contract specified that H.Z. and Y.J. would pay a 20 percent deposit to be applied exclusively toward pre-construction costs set forth in the contract. VALDES also represented that all money paid by H.Z. and Y.J. would be used exclusively for the Bethune Street Project.

12. At the time VALDES made these representations to H.Z. and Y.J., VALDES knew H.Z. and Y.J.'s deposit would not be used for pre-construction costs on the Bethune Street Project but would instead be used to pay pre-existing liabilities. VALDES made these false representations to induce H.Z. and Y.J. to enter the contract and make payments to ARTIFACT. H.Z. and Y.J. relied on these representations when they entered the contract with ARTIFACT and made payments to ARTIFACT.

13. On or about June 9, 2017, VALDES deposited a check for $52,000 from H.Z. into ARTIFACT's Capital One account ending in 7208. This check was the first installment of H.Z. and Y.J.'s pre-construction deposit. By on or about September 25, 2017, VALDES had spent all of H.Z. and Y.J.'s $52,000 deposit installment. Over $49,000 of the $52,000 installment was spent on expenses unrelated to the Bethune Street Project, including expenditures on properties ARTIFACT was building for J.P.V.'s companies.

14. On or about October 3, 2017, H.Z. and Y.J. wired approximately $113,858 to ARTIFACT's Capital One account ending in 7208. To execute the wire transfer, wire communications were transmitted from within the Eastern District of Virginia to servers located outside of the Commonwealth of Virginia.

15. Approximately $52,000 of this payment consisted of H.Z. and Y.J.'s second deposit installment, and according to the draw schedule in the contract, the remaining $61,858 of this wire transfer consisted of H.Z. and Y.J.'s payment to ARTIFACT for site clearing, excavation, and foundation expenses. Before H.Z. and Y.J. agreed to make this payment to ARTIFACT and VALDES, VALDES told them that this money would be used exclusively for the Bethune Street Project, specifically for the clearing, excavation, and foundation expenses. VALDES knew these representations to H.Z. and Y.J. were false, and he made these misrepresentations in order to induce H.Z. and Y.J. to make the $113,858 wire transfer to ARTIFACT. H.Z. and Y.J. relied on the agreed upon draw schedule and VALDES's verbal representations when they made this payment to VALDES.

16. By on or about November 13, 2017, VALDES had spent nearly all of H.Z. and Y.J.'s second payment to ARTIFACT. Between on or about October 3, 2017, and on or about November 13, 2017, VALDES paid a total of $1,728 to Fairfax County, the Treasurer of Virginia, and DeMarr Construction for expenses related to the Bethune Street Project. Over $111,000 of H.Z. and Y.J.'s $113,858 payment to ARTIFACT was spent on expenses unrelated to the Bethune Street Project, including expenditures on properties ARTIFACT was building for VALDES's brother's companies.

17. Between approximately June 2017 and March 2018, H.Z. and Y.J. paid ARTIFACT $278,466. According to the contract, draw schedule, and VALDES's representations to H.Z. and

Y.J., these payments were to be used for permit applications, demolition, excavation, foundation, and framing expenses on the Bethune Street Project. By approximately August 2018, the only work performed by ARTIFACT on the Bethune Street Project was the demolition of the existing structure and excavation, as well as obtaining various permits from the county.

18. Although VALDES engaged a subcontractor to pour the foundation for the Bethune Street Project, VALDES did not pay the subcontractor for the work it performed. Because of VALDES's non-payment, the subcontractor placed a mechanic's lien for $43,827 on H.Z. and Y.J.'s Bethune Street property.

19. In total, ARTIFACT spent no more than $49,000 on the minimal work that was performed on the Bethune Street Project. Although H.Z. and Y.J. asked VALDES to return their money, ARTIFACT only returned approximately $20,000. Because VALDES returned this money to H.Z. and Y.J. shortly before VALDES declared bankruptcy, the bankruptcy trustee required H.Z. and Y.J. to surrender these funds. To date, H.Z. and Y.J. have not recuperated any of the funds VALDES fraudulently obtained from them.

<u>Fraud Involving VICTIMS M.Z. and C.X.</u>

20. Victims M.Z. and C.X. are the owners of a residential property located on Windy Hill Road in McLean, Virginia, within the Eastern District of Virginia. M.Z. is C.X.'s spouse.

21. On or about September 5, 2017, M.Z. and C.X. signed a contract with ARTIFACT to demolish the existing home and build a custom home on their property on Windy Hill Road for a fixed price of one million dollars ("the Windy Hill Project"). The contract specified that M.Z. and C.X. would pay a 20 percent deposit to be applied exclusively toward pre-construction costs set forth in the contract. VALDES also represented that all money paid by M.Z. and C.X. would be used exclusively for the Windy Hill Project.

5

22. At the time VALDES made these representations to M.Z. and C.X., VALDES knew their deposit would not be used for pre-construction costs on the Windy Hill Project but would instead be used to pay pre-existing liabilities. VALDES made these false representations in order to induce M.Z. and C.X. to enter the contract and make payments to ARTIFACT. M.Z. and C.X. relied on these false representations when they entered the contract with ARTIFACT and paid the deposit to ARTIFACT.

23. On or about September 11, 2017, VALDES deposited a check for $100,000 from M.Z. into ARTIFACT's Capital One account ending in 7208. This check was the first installment of M.Z. and C.X.'s pre-construction deposit. By approximately September 25, 2017, VALDES spent all of M.Z. and C.X.'s $100,000 deposit installment on expenses completely unrelated to the Windy Hill Project, including expenditures on properties ARTIFACT was building for his brother's companies.

24. On or about March 9, 2018, VALDES sent an email to M.Z., stating "I have to make deposits for Clearing, Foundations, and Framing urgently . . . ." At the time VALDES sent this email to M.Z., VALDES did not intend to use M.Z.'s second deposit installment toward clearing, foundation, and framing on the Windy Hill Project. VALDES made this misrepresentation in order to induce M.Z. to pay the second installment deposit of $100,000.

25. On or about March 10, 2018, after receiving the aforementioned email from VALDES, M.Z. wrote a check to ARTIFACT for $100,000 for the second installment of M.Z. and C.X.'s deposit. By approximately March 23, 2018, VALDES had spent all of M.Z. and C.X.'s second $100,000 deposit installment. At least $98,000 of M.Z. and C.X.s second deposit installment was spent on expenses unrelated the Windy Hill Project, including approximately $15,000 total in cash withdrawals and checks VALDES wrote to himself.

26. Between approximately September 2017 and approximately April 2018, M.Z. and C.X. paid ARTIFACT $250,000. By August of 2018, the only work performed by ARTIFACT on M.Z. and C.X.'s property was the demolition of the existing structure, excavation, and obtaining various permits from the county. On or about August 27, 2018, M.Z. and C.X. terminated the contract with ARTIFACT.

27. ARTIFACT spent no more than $40,200 on the minimal work that was performed on the Windy Hill Project. Although M.Z. asked VALDES to return his money, ARTIFACT never returned any of the $250,000 M.Z. and C.X. paid.

Fraud Involving VICTIMS B.Y. and J.S.

28. VICTIMS B.Y. and J.S. are the owners of a residential property located in McLean, Virginia, within the Eastern District of Virginia. J.S. is B.Y.'s spouse.

29. On or about May 23, 2017, B.Y. and J.S. contracted with ARTIFACT to demolish their existing home and build a custom home on their property in McLean, Virginia.

30. In or around April 2018, VALDES requested an in-person meeting with B.Y. and J.S. During that meeting, VALDES told B.Y. and J.S. that he needed a loan due to cash flow difficulties arising from other ARTIFACT clients' failure to pay. B.Y. told VALDES that B.Y. needed to review ARTIFACT's financial statements before he could agree to lend VALDES or ARTIFACT money.

31. After the in-person meeting with B.Y. and J.S., VALDES provided B.Y. with a balance sheet for ARTIFACT dated March 31, 2018. The balance sheet contained materially false representations to make it appear that ARTIFACT was in a better financial position than it actually was, and to thereby induce B.Y. to lend ARTIFACT money. For instance, the balance sheet stated that ARTIFACT's Capital One account balance was $45,110, when in reality, as VALDES knew,

7

ARTIFACT's two Capital One accounts had a combined balance of $24,973. Additionally, the balance sheet stated that, as of March 31, 2018, ARTIFACT had an outstanding American Express credit card balance of approximately $266,960, when in reality, as VALDES knew, ARTIFACT's American Express balance was approximately $392,531. Accordingly, VALDES overstated ARTIFACT's cash balance by $20,137 and understated ARTIFACT's credit card balance by $125,571, for an overall misrepresentation of at least $145,708.

32. Moreover, the balance sheet listed several construction projects as assets totaling over $6.6 million. In fact, VALDES knew these projects were not assets at all, but rather liabilities because VALDES had received payment for these projects but had not completed the work for which he had been paid. Although these incomplete projects were listed as liabilities as well, the net effect was to grossly overstate ARTIFACT's assets.

33. Based on the materially false representations in the balance sheet VALDES provided to B.Y., B.Y. agreed to lend ARTIFACT $250,000. B.Y. would not have lent money to ARTIFACT if B.Y. had been given true and accurate statements of ARTIFACT's finances.

34. On or about April 27, 2018, B.Y. wired $250,000 from his bank at Hanscom Federal Credit Union, in McLean, Virginia, to ARTIFACT's Capital One bank account.

35. When the loan came due on or about July 20, 2018, VALDES did not repay B.Y. Instead, VALDES asked B.Y. for an extension of time to repay the loan. VALDES again provided B.Y. with a balance sheet that contained materially false information. For instance, the balance sheet indicated that the balance in ARTIFACT's Capital One bank account as of July 31, 2018, was $24,610. In reality, as VALDES knew, ARTIFACT's Capital One bank accounts had a combined balance of $244 on that date. Likewise, the balance sheet shows credit card debt with American Express in the amount of $179,234, when in reality, as VALDES also knew,

ARTIFACT's American Express credit card had a balance of over $432,000. By overstating ARTIFACT's assets and understating its liabilities in the balance sheet, VALDES sought to induce B.Y. to give ARTIFACT additional time to repay the loan.

36. Based on the false representations in the balance sheet VALDES provided to B.Y., B.Y. agreed to extend the deadline for loan repayment. VALDES and ARTIFACT filed for bankruptcy on approximately September 28, 2018. B.Y. has not received repayment of any of the $250,000 he loaned to ARTIFACT.

37. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

38. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date: 11/8/22     By: /s/ Heidi B. Gesch
Heidi B. Gesch
Russell L. Carlberg
Assistant United States Attorneys

9

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, PEDRO FELIPE VALDES, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
PEDRO FELIPE VALDES

I am Aaron S. Book, defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Aaron S. Book, Esq.
Attorney for PEDRO FELIPE VALDES